**In re GRAND JURY SUBPOENA DATED NOVEMBER 9, 1979.**

No. M–11–188.

United States District Court,
S. D. New York.

Jan. 24, 1980.

As Amended Feb. 21, 1980.

Supplemental Order Jan. 31, 1980.

Supplemental Order Amended
March 13, 1980.

Kostelanetz & Ritholz, New York City, for the subpoenaed firm; Jules Ritholz, Frank L. Amoroso, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for the Government; Roanne L. Mann, Stuart J. Baskin, Dominic F. Amoroso, Asst. U. S. Attys., New York City, of counsel.

## OPINION

WERKER, District Judge.

This is a motion to quash a grand jury subpoena duces tecum served on a law firm

(the "subpoenaed firm")[1] directing it to produce any and all tape recordings of any statements made by certain named individuals.

## BACKGROUND

Since May 1979, a grand jury has been conducting an investigation into alleged illicit drug manufacturing activities and alleged attempts to obstruct justice in connection therewith. As a result of this investigation, John Doe was indicted in October 1979 and charged with conspiring to violate the federal drug laws, unlawfully possessing and distributing drug controlled substances, conspiring to obstruct justice, and making false and fraudulent statements to a federal agency. The investigation is continuing as to other presently unindicted individuals, who are believed by the Government to have been involved with Doe.

A prior law firm (the "prior firm") has been representing Doe in connection with the grand jury investigation since May 18, 1979. The subpoenaed firm is co-counsel with the prior firm and is counsel of record in the criminal action pending against Doe. At some point prior to the service of the subpoena at issue herein, the prior firm transferred all of its records and files pertaining to this matter, including any items possibly covered by the subpoena, to the subpoenaed firm.

The Government has reason to believe that, in the course of the prior firm's investigation into the alleged drug manufacturing activities, an associate at that firm surreptitiously recorded conversations he had with certain individuals still under investigation. On November 9, 1979, the subpoena duces tecum which is the subject of this motion was issued, commanding the subpoenaed firm to produce:

> Any and all tape-recordings or other mechanical recordings in your possession, custody or control . . . which record or reflect statements made by any of the following individuals. . . .

The subpoenaed firm moves to quash the subpoena on three grounds. First, the firm contends that the subpoena constitutes an abuse of the grand jury process in that it is intended to gather evidence to be used in connection with an already pending indictment (the Doe indictment). Second, the firm claims that the tape recordings, assuming they exist, are protected from discovery by the work product doctrine. Third, the firm maintains that any tape recordings made of conversations between the attorney and one of the individuals named in the subpoena are protected from discovery by virtue of the attorney-client privilege. The subpoenaed firm does not concede that any such tape recordings exist, and contends that even the existence *vel non* of any tape recordings should be protected from discovery.

## DISCUSSION

### A. *The Abuse of Grand Jury Process Claim*

■ The subpoenaed firm's contention that the Government has acted in bad faith in issuing the subpoena must be rejected. Although Doe has already been indicted, it is clear that other unindicted individuals—including those named in the subpoena—remain under investigation in connection with the events in question. The Government maintains, and there is no reason to believe otherwise, that the persons named in the subpoena are all still subjects of the continuing grand jury investigation. *See* affid. of Roanne L. Mann, sworn to Dec. 13, 1979, at ¶ 2. I am persuaded that the subpoena was issued in good faith for the purpose of obtaining evidence not against Doe but against other unindicted individuals. Accordingly, the motion to quash is denied insofar as it is based on the abuse of grand jury process claim. *See also* Judge Carter's denial on the record of a similar motion to quash, transcript annexed to Mann affid., exh. D.

---

1. Since some of the matters in issue are still under grand jury investigation, certain names have been changed and others omitted for purposes of publication.

## B. *The Work Product Doctrine*

■ The subpoenaed firm argues that the subpoenaed materials, to the extent they exist at all, were prepared by the prior firm in anticipation of litigation.[2] Consequently, the firm contends, the tape recordings are protected from disclosure by the work product doctrine first recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Although the codifications of the doctrine in Rule 26(b)(3) of the Federal Rules of Civil Procedure and 16(b)(2) of the Federal Rules of Criminal Procedure do not govern grand jury proceedings, it is clear that the work product doctrine is applicable to grand jury matters. *In re Grand Jury Investigation*, 599 F.2d 1224, 1228 (3d Cir. 1979); *In re Grand Jury Subpoena Dated Dec. 19, 1978*, 599 F.2d 504, 509 (2d Cir. 1979); *In re Grand Jury Proceedings (Duffy)*, 473 F.2d 840 (8th Cir. 1973). *See also United States v. Nobles*, 422 U.S. 225, 236, 95 S.Ct. 2160, 2169, 45 L.Ed.2d 141 (1975).

In opposing the motion to quash the subpoena, the Government sets forth two arguments with respect to the work product claim. First, the Government contends that the tape recordings were unethically made and that the work product doctrine should thus not be applied. Second, the Government argues that even if the work product rule is applied, sufficient cause exists for overriding the qualified protection afforded to attorney work product.

■ The Government's first argument is not persuasive. In light of the New York State Bar Association's most recent opinion concerning attorneys recording conversations without the consent of the other party, it is not clear that the tapes at issue herein were unethically made. *See* Committee on Professional Ethics of New York State Bar Association, Opinion No. 515, *reprinted in* N.Y.L.J., Jan. 9, 1980, at 1, col. 2, *modifying* Opinion No. 32 (1974). In addition, even if it is assumed the tapes were made unethically, I am not convinced that the work product doctrine would not be applicable. The policies underlying the doctrine are directed at protecting an attorney's mental impressions and thought processes and "providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. at 238, 95 S.Ct. at 2170; *see Hickman v. Taylor*, 329 U.S. at 510–11, 67 S.Ct. at 393. The work product rule is simply not intended to govern or control the manner in which an attorney prepares his case, but rather, it is intended to shelter his thinking as he does so. In any event, while I do not want to underplay the ethical considerations, I would prefer not to decide this motion on the basis of ethics. Accordingly, I will assume the tapes were made ethically.

■ The Government's second argument is premised on its contention that the protection afforded work product is qualified and not absolute. This contention is well supported by the case law. In *United States v. Nobles*, the Supreme Court stated that the protection derived from the doctrine is "not absolute." 422 U.S. at 239, 95 S.Ct. at 2170. And, in *Hickman v. Taylor*, the Court explained:

> We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and nonprivileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment or corroboration. And production might be justified where the witnesses are no longer available or can be reached only with difficulty.

329 U.S. at 511, 67 S.Ct. at 394. Hence, the key issue at hand is whether the Govern-

---

**2.** If the tapes do exist, they were made in anticipation of litigation by Doe's attorneys. Thus, I will assume that they do constitute attorney work product. The Government has not argued otherwise.

ment has made a sufficient showing of need to overcome the qualified protection afforded by the work product doctrine.

The few courts that have considered this issue with respect to grand jury matters have not articulated a definitive standard as to "how much" good cause or necessity is sufficient to overcome the work product protection. Instead, the courts have examined a number of factors, such as the uses to which the subpoenaed material will be put, the nature of the material requested, the availability of alternative means of obtaining the information sought, and the extent to which the Government's asserted need for the requested information is substantiated. *See In re Grand Jury Investigation*, 599 F.2d at 1231–33; *In re Grand Jury Subpoena Dated Dec. 19, 1978*, 599 F.2d at 512–13; *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F.Supp. 368, 374–75 (E.D.Wis.1979).

█ In the instant case, the Government believes "that the subpoenaed tape recordings constitute evidence of overt acts committed . . . in furtherance of a conspiracy to cover-up [the] illegal activities" in question. Government's Mem. in Opp. to Motion, at 9. The Government anticipates presenting the tapes to the grand jury now investigating certain unindicted individuals in the hopes of securing indictments. The Government contends that this is sufficient cause to overcome the qualified protection afforded by the work product rule.[3]

The necessity claimed by the Government herein is far more compelling than that asserted by the Government in *In re Grand Jury Subpoena Dated Dec. 19, 1978, supra*, a case upon which the subpoenaed firm places great reliance. The Government in that case sought certain materials in order to determine to which witnesses to grant immunity. 599 F.2d at 512. The second circuit rejected this assertion of need, stating: "We do not believe that searching an attorney's legitimate work product is necessary to the normal bargaining to which a prosecutor resorts in recommending immunity."

*Id.* at 513. In the instant case, the Government is not simply seeking information to assist it in deciding to whom to grant immunity. Instead, the Government is seeking what it believes to be evidence of an illegal cover-up, evidence which it intends to present to the grand jury in its attempt to obtain indictments. This claim of necessity is even stronger than one asserted by the Government—and accepted by the court—in *In re Grand Jury Investigation, supra.* The Government there sought certain written statements of witnesses in order to assess their credibility. The third circuit concluded that "the government may be entitled to discover an employee's questionnaire to impeach or corroborate the testimony of that employee before the grand jury." 599 F.2d at 1233. Although the court declined to order production of the questionnaires at that point in time because the grand jury had not yet summoned any witnesses, it clearly stated that the asserted need would be sufficient at the appropriate time. *Id.* The claim of necessity in this case is more persuasive than the assertion that material is needed to impeach or corroborate a witness's testimony.

The quantum of necessity sufficient to overcome the protection afforded by the work doctrine has varied according to the nature of the material being sought. Some courts have gone so far as to hold, with respect to attorneys' memoranda or notes of witness interviews, that the protection is absolute or virtually absolute. *See, e. g., In re Grand Jury Proceedings (Duffy)*, 473 F.2d at 848; *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F.Supp. at 374; *In re Grand Jury Investigation (Sturgis)*, 412 F.Supp. 943, 949 (E.D.Pa.1976). *See Hickman v. Taylor*, 329 U.S. at 512–13, 67 S.Ct. at 394. On the other hand, there is authority to effect that where the material sought is or would lead to admissible evidence, sufficient cause exists for compelling discovery. *See United States v. Nobles*, 422 U.S. at 251, 95 S.Ct. at 2176 (White, J., concurring); *Hickman v. Taylor*, 329 U.S. at

---

3. The Government stated on the record at oral argument on December 18, 1979 that it will not use the tapes on its direct case at trial if matters should proceed that far.

515, 67 S.Ct. at 395 (Jackson, J., concurring); F. James, *Civil Procedure* § 6.10, at 211 & n.13 (1965).

The instant motion does not involve an attorney's notes or memoranda of an interview with a witness. Instead, the attorney in question mechanically recorded conversations he had with certain individuals who were and are under grand jury investigation. Although it is not clear to what extent the attorney actively asked questions or expressed his opinions and thoughts in the course of the conversations,[4] it is clear that any tape recordings of such conversations would be less reflective of the attorney's thought processes than any of his notes or memoranda would be. The tape recordings can also be redacted so as to eliminate statements made by the attorney wherever possible. Hence, the tape recordings are entitled to less protection than the attorney's notes or memoranda would be.

In determining whether sufficient cause has been shown to overcome the work product protection, the courts have examined the availability of alternative means of obtaining the information sought. In *In re Grand Jury Subpoena Dated Dec. 19, 1978,* supra, the second circuit noted that the Government had a number of means available to it of gathering information with which to make immunity decisions. For example, fourteen individuals had been interviewed by the Government without invoking the fifth amendment. In addition, the corporation which was under investigation and its attorneys had cooperated with the Government by providing information and certain documents. Thus, the second circuit felt that the "argument that the work product [was] needed to make decisions on immunity grants is farfetched." 599 F.2d at 512. Similarly, the third circuit in *In re Grand Jury Investigation, supra,* refused to override the work product rule in part because the Government had not pursued all its options: it was seeking questionnaires filled out by certain individuals, but had made no attempts to interview

these individuals first. 599 F.2d at 1232. In the instant case, there do not appear to be any alternatives available. The four individuals named in the subpoenaed were summoned to testify before the grand jury; three out of the four asserted their fifth amendment privilege against self-incrimination. In any event, it is unlikely that the Government can otherwise obtain the subpoenaed material for the individuals whose statements were recorded will undoubtedly refrain from repeating any of these statements, if they were indeed made to further a conspiracy to cover-up criminal activity.

The Government has substantiated its claim of necessity. In a sworn affidavit, one of the Assistant United States Attorneys assigned to this investigation states that one of the persons involved in the events in question is cooperating, that this person has made tape recordings of conversations he had with individuals under investigation, and that these conversations evidence a conspiracy to cover-up the activities in question. *See* Mann affid., at ¶¶ 3–6. More specifically, the Government contends that this person taped a conversation between himself and Doe on June 27, 1979 in which Doe stated that certain of the individuals named in the subpoena had spoken with his attorney at the prior firm, that tape recordings had been made of these conversations, that one of these individuals had provided " 'a complete fabrication,' " and that another had " 'told a blatant lie.' " *Id.* at ¶ 4. The fact that the grand jury is indeed investigating a possible cover-up is substantiated by the fact that Doe has already been indicted for conspiring to obstruct justice.

In *In re Grand Jury Investigation, supra,* the third circuit was confronted with an assertion of necessity similar to the one claimed herein. The Government in that case was investigating a possible corporate cover-up of certain questionable transactions, and subpoenaed certain materials to determine " 'what was stated when to whom.' " 599 F.2d at 1232. Although the

---

4. The Court has been presented with virtually no information as to the nature of the tapes.

Indeed, it is not even clear whether any tapes exist at all.

court rejected this claim, it did so not because it felt the claimed necessity was insufficient, but because the Government had not "filed an affidavit with the district court or otherwise presented a substantiated claim that the grand jury suspected an illegal cover-up. We have only the government's naked assertion that it might discover such a cover-up if granted access to these materials." *Id.* The third circuit did not indicate that it would have rejected the claim of necessity had the Government provided some substantiation. In the instant situation, the Government has provided more than a "naked assertion," and has substantiated its belief that there was a conspiracy to obstruct justice.

The factors discussed above and the principles underlying the work product doctrine must be considered in the context of the importance of the ability of parties to an adversarial criminal proceeding to obtain needed evidence. *See United States v. Nixon*, 418 U.S. 683, 709, 713, 94 S.Ct. 3090, 3108, 3110, 41 L.Ed.2d 1039 (1974). It is well recognized that "the longstanding principle that 'the public . . . has a right to every man's evidence' . . . is particularly applicable to grand jury proceedings." *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, (1972) (citations and footnote omitted). With this tenet in mind, and given the circumstances of this case, I find that the Government has asserted sufficient cause to overcome the protection afforded by the work .product doctrine. However, because my decision is premised in part on the Government's belief, albeit a substantiated belief, that the tape recordings constitute evidence of a crime, I will listen to the tapes *in camera* before issuing an order directing the subpoenaed firm to turn the tapes over to the Government. Should the Government's belief turn out to be incorrect, the motion to quash will have to be reconsidered.

### C. *The Attorney-Client Privilege*

The subpoenaed firm argues that any tape recordings made of conversations between the prior firm and one of the individuals named in the subpoena, Richard Roe, are protected from discovery by virtue of the attorney-client privilege. Because it was not clear whether an attorney-client relationship existed at the time the statements may have been recorded, a hearing was held on December 28, 1979, at which an associate from the prior firm (the "associate") and Roe's present attorney testified. My findings of fact and conclusions of law follow.

On May 21, 1979, the associate met with Doe at the offices of the prior firm and discussed the events in question. At some point during that day, Doe made a telephone call and as a result of that call, Roe and another individual arrived at the prior firm's offices. The associate met with all three individuals and answered questions they had concerning legal matters relating to the investigation now in issue. Thereafter, the associate spoke to Roe several times by telephone. Tr. 6–9.

The associate testified that he had given Roe legal advice, but he did not at any time represent him nor was he ever asked to do so, within his definition of the word "represent," *i. e.*, to appear on behalf of Roe. Roe did not enter into a retainer agreement with the prior firm and did not at any time pay that firm legal fees. Roe did not appear before the prior firm's new business committee for screening as a potential client. Tr. at 13, 15–17, 19, 21, 29, 33–34.

On June 14, 1979, the associate was advised that Roe had retained his present counsel. The associate spoke to Roe's counsel that day and again a number of times thereafter about the investigation. Although the associate testified that he supplied Roe's counsel with "various documents," Tr. 12, the latter could only recall receiving one document. Tr. 49. This document did not relate to Roe.

After the subpoenaed firm became involved in this matter, the prior firm transferred all of its files to the subpoenaed firm, including all items pertaining to Roe. The associate did not obtain Roe's counsel's consent to the production to the subpoenaed firm of any material concerning statements made by Roe to his counsel. *See* Tr. 42, 48,

54. Roe's counsel did not at any time ask for or receive any tape recordings, and no mention of tapes had been made to him at the times in question. Tr. 50–51, 54.

■ The burden of establishing the existence of an attorney-client relationship rests on the party asserting the privilege. *United States v. Stern*, 511 F.2d 1364, 1367 (2d Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975); *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965). As the second circuit recognized in the *Bonanno* case, "That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." 344 F.2d at 833. Hence, the associate's conclusory, after-the-fact assertions that an attorney-client relationship or privilege existed are insufficient to carry the burden. *See* Tr. 31, 38.

■ In order to establish the existence of the privilege with respect to particular communications, the party asserting the privilege must show that the communications were made "in the course of an effort to obtain legal advice from a professional legal adviser acting in his capacity as such." *United States v. DeMauro*, 581 F.2d 50, 55 (2d Cir. 1978); *see also In re Bonanno*, 344 F.2d at 833.

■ The subpoenaed firm has failed to meet its burden. The evidence shows, and I so find, that no attorney-client relationship existed between Roe and the associate. The prior firm did not have a retainer agreement with Roe, did not receive fees from or on behalf of Roe, and did not place Roe before its new business committee for screening. While these factors are not necessary to a finding of the existence of an attorney-client relationship, they are relevant and may be considered. Roe did not ask the associate to represent him, nor did he ask the associate to serve as his lawyer. Although the associate did apparently answer some legal questions for Roe, it is clear that this was done in the course of and as part of the associate's representation of

Doe. Roe arrived at the prior firm's office on May 21, 1979 because of Doe's telephone call. It is apparent that the associate interviewed Roe as a third party witness, and that in the course of doing so he informally gave Roe some legal advice. The subpoenaed firm did not establish that Roe sought the associate out for the purpose of obtaining advice. In fact, when Roe finally decided he needed an attorney, he sought out his present counsel, who had been a family friend for a number of years. Tr. 45.

The associate's view of these matters is important. He testified that in the course of his conversations with Roe, the question of whether an attorney-client privilege existed did not enter his mind. Tr. 38. He did not, then, at any time advise Roe that any statements made to him would be kept confidential. When the associate turned over the prior firm's files to the subpoenaed firm, he did not attempt or even think about obtaining consent from Roe or his counsel. If an attorney-client privilege had existed, the associate should not have disclosed statements made to him by Roe in confidence without first obtaining Roe's consent.

The fact that the associate may have recorded Roe's statements without his consent is further indication that Roe was not a client of the firm. If he was indeed a client, there would have been no reason for the firm to surreptitiously record his statements. In *United States v. Stern, supra,* the second circuit was faced with a similar situation. There, an attorney, who was under criminal investigation, taped a conversation he had with the defendant in order to prove that he was not connected with certain questionable bonds. The defendant claimed that his recorded statements were protected from discovery by the attorney-client privilege. In rejecting this claim, the court noted that "[t]he [taped] conversation itself is the most convincing evidence that it occurred not in any attorney-client context, but in the context of two men under investigation trying to protect themselves from any nuances of corruption that might spill over from one investigation to the other." 511 F.2d at 1366. In the instant case, it

would appear that Doe's attorneys were trying to protect him by memorializing the apparently changing stories of other targets of the investigation, including Roe. *See* Transcript of Dec. 18, 1979 hearing, at 5. Additionally, Roe's counsel was never advised of the existence of any tapes. If any tapes of Roe's statements were in existence, and if Roe had indeed been considered a client, the associate would have or should have informed Roe's counsel of these tapes.

The facts of this case are similar to those of *In re Bonanno.* There, Bonanno refused to answer certain questions asked of him in the course of a grand jury investigation on the basis of an asserted attorney-client privilege. These questions concerned conversations he had had with William Maloney, who was Bonanno's father's attorney. Both Maloney and Bonanno testified at the hearing to resolve the privilege issue, and neither was able to give specifics as to the date Maloney had been retained or the terms of the retainer. In view of the shallowness of Bonanno's evidence and the inconsistencies in the testimony, the second circuit affirmed the district court's finding that an attorney-client relationship had not existed, notwithstanding the *ipse dixit* assertions otherwise. 344 F.2d at 831–33.

In *Hickman v. Taylor,* the Supreme Court observed that "the protective cloak of [the attorney-client] privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation." 329 U.S. at 508, 67 S.Ct. at 392. Since this unwarranted extension of the privilege is precisely what the subpoenaed firm seeks in the motion at hand, the motion must be denied.[5]

## CONCLUSION

In accordance with the above, the motion to quash is denied. The subpoenaed firm is directed to submit any and all tape recordings or other mechanical recordings in its possession, custody or control which record or reflect statements made by any of the individuals named in the November 9, 1979 subpoena to my chambers on or before January 29, 1980 for an *in camera* examination.[6]

SO ORDERED.

## SUPPLEMENTAL ORDER

In accordance with my opinion and order of January 24, 1980, the subpoenaed firm submitted a number of tape recordings to me on January 29, 1980. I have listened to the tapes *in camera*, and I find that only one recorded conversation should be turned over to the Government. The remaining taped conversations do not contain any statements which could constitute evidence of a conspiracy to obstruct justice or a cover-up of the activities in question. Additionally, the tape recordings do not contain anything which persuades me to modify my January 24th decision with respect to the attorney-client privilege issue.

In accordance with my January 24th opinion and my *in camera* inspection of the tape recordings, the subpoenaed firm is hereby directed to turn over to the Government by 5 p. m. Monday, February 4, 1980, the recording of the conversation between the associate and Richard Roe which begins "The rest of the Simian Expansion papers . . . ." The motion to quash the subpoena is granted as to the balance of the tape recordings; the grand jury subpoena *duces tecum* dated November 9, 1979 is hereby quashed insofar as it seeks the production of all recordings other than the one identified above. All the tape recordings and transcripts are being returned today to the subpoenaed firm.

SO ORDERED.

---

5. Since the tape recordings are initially being heard *in camera*, the motion to quash may be reconsidered if the statements on the tapes should cast a different light on the matters in question.

6. In light of the above, the Government's motion to reopen and expand the hearing record of December 28, 1979 is rendered moot.